EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* SALVADOR GUZMÁN TORO, acusado y apelante.

Número: CR-78-21     Resuelto: 11 de octubre de 1978

*Benigno Alicea Alicea,* abogado del apelante; *Héctor A. Colón Cruz, Procurador General,* y *Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Salvador Guzmán Toro fue acusado y encontrado culpable por jurado del delito de Asesinato en Primer Grado por la muerte el 28 de julio de 1976, de su ex-esposa Jean Marie Rexach Santana, a la cual le infirió cinco (5) heridas de bala. Fue sentenciado a reclusión perpetua. No conforme, por propio derecho apeló. Su alegato fue presentado por la Sociedad para Asistencia Legal.

Analizaremos separadamente sus señalamientos.

PRIMERO: "Cometió error la ilustre sala sentenciadora al declarar culpable al apelante del delito de Asesinato en Primer Grado habiéndose probado, a lo sumo, un delito de homicidio."

■ No tiene razón. El examen total de la prueba refleja que se establecieron más allá de duda razonable los elementos de malicia premeditada, deliberación y premeditación, constitutivos del delito de Asesinato en Primer Grado. A tal efecto, reproducimos el resumen del alegato del Procurador, que de manera más detallada relaciona la prueba de cargo:

"La testigo de cargo *Georgina Santana Correa* (T.E., Tomo I, págs. 104–404) declaró, entre otras cosas lo siguiente: que para el día de los hechos ella vivía con su hija Jean (la occisa) y su nieto Juan Carlos (hijo del apelante) en su residencia sita en la calle Perseo Núm. 506, Urb. Altamira (lugar de los hechos) (T.E. págs. 105–106); que su hija vivía con ella desde noviembre de 1975 cuando se separó de su esposo, el aquí apelante (T.E. pág. 106); declaró que el día de los hechos a su hija se le había quedado la cartera en la casa y que por ese motivo había ido a almorzar (T.E. pág. 110); que mientras está almorzando la occisa llega el niño y desde fuera de la casa le pide permiso para ir con el apelante a recortarse (T.E. pág. 114); la occisa le manifestó al niño 'hoy no le toca a tu papá venir a buscarte, eso será el sábado' (T.E. pág. 115); que la occisa posteriormente terminó de almorzar y mientras se disponía a abrir el portón de rejas de la marquesina, vio que llegó nuevamente el niño, esta vez acompañado de su padre (el apelante) y se detuvieron al frente de la casa; que ella pudo verlos debido al hecho de que estaba en la ventana observando a la occisa y que estaba en dicha ventana por razón de que '. . . Guzmán [refiriéndose al apelante] ya le había dado y la había golpeado anteriormente y yo tenía miedo de que le fuera a pasar lo mismo . . .' (T.E. págs. 116–117); que el niño le volvió a preguntar si podía ir con el apelante a recortarse, a lo que la occisa le volvió a contestar que lo dejara para el sábado que era cuando a su papá le correspondía llevarlo (T.E. pág. 117); que el apelante se desmontó de su automóvil y le preguntó a la occisa '¿Me vas a dejar llevar el niño a recortar hoy?' y sucede lo siguiente: 'ella le dijo, no, hoy no, porque no te toca, déjalo para el sábado. Y entonces él le dice, ¿cómo que no? Y ahí, inmediatamente fue una cosa tan rápida que sacó un

arma del lado derecho y le tiró dos tiros a mi hija'. (T.E. pág. 119); que luego el apelante adelanta como veintidós pies hacia donde se encontraba tirada en el suelo la occisa, revólver en mano, mirando fijamente hacia donde estaba la occisa y cuando llega a una distancia que la testigo considera como 'en los pies de mi hija', se encorvó un poco y manifiesta *'para acabar contigo'* e inmediatamente hace tres disparos (Subrayado nuestro, T.E. pág. 123).

Dicha testigo declaró además, sobre una serie de incidentes violentos en los cuales se había visto envuelta, tanto ella como su hija (la occisa) con el aquí apelante. Relató que en una ocasión allá para principios del mes de diciembre de 1975 se encontraba con su hija (ya ésta se había separado del aquí apelante durante el mes de noviembre de 1975) en su residencia de Altamira; que mientras ella se encontraba barriendo el interior de la casa, su hija estaba '. . . afuera en el porch (sic) echándole agua a las matas y cuando yo oigo un gemido, salgo corriendo a la parte de afuera y era que Salvador Guzmán la tenía tirada en el último escalón, él encima de ella . . .'—'. . . ella tenía sus manos en la cara porque estaba tratando de darle y le daba contra el escalón y él quería destrozar su cara y ella tenía sus manos en la cara . . .' (T.E. págs. 129 y 130); que mientras ella y su hija retrocedieron hacia el interior de la casa, el apelante decía 'voy acabar con ustedes dos, la voy a matar, voy a acabar con ella, *la quiero matar*, si ella no es mía no es de nadie'. (Subrayado nuestro.) (T.E. pág. 131.)

En otra instancia declaró que el apelante, también durante el mes de diciembre de 1975, llegó súbitamente a la residencia de la testigo, la empujó, agarró por el cuello a la occisa y la apretó y le dijo: 'vamos para adentro que voy a matarte, voy acabar contigo, hoy voy a acabar contigo'—que ambas gritaron y los vecinos llamaron a la policía—el apelante se fue cuando le dijeron que la policía estaba cerca. (T.E. pág. 134.)

Continuó la testigo mencionando incidentes y atestó que en otra ocasión el apelante la llamó por teléfono y la amenazó de muerte tanto a ella como a la occisa (T.E. pág. 136); que en otra ocasión en que la testigo y su hija se dirigían a casa de su hijo el Lic. Jorge Luis Rexach Santana, el apelante las iba siguiendo en su automóvil y en determinado momento (estando un semáforo con la luz roja) se detuvo al lado de ellas y se bajó de su vehículo en una actitud muy desafiante—pero ocurrió el cam-

bio de luz y ellas aceleraron su automóvil hacia la residencia del susodicho Lic. Rexach Santana (T.E. págs. 137–140).

Igualmente declaró la testigo que para el mes de marzo de 1976, un día llegó la occisa de su trabajo como de cinco y media a seis de la tarde, y bajándose ella del carro, llegó el apelante detrás; que mientras ella cerraba el portón de rejas de la marquesina, él metió la mano por el portón y la cogió por el pelo y le dio una bofetada. (T.E. pág. 142.)

Finalmente, señaló la testigo que para el día 10 de abril de 1976, volvió el apelante a amenazarlas, a ella y a la occisa, mediante llamada telefónica. Indicó que en esa ocasión la occisa manifestó que ya era demasiado, que no podían continuar con esa situación, que era terrible y que le dieron parte a la policía. Atestó que precisamente por este incidente habían denunciado al apelante. (T.E. pág. 144.)

De otra parte, la testigo de cargo (refutación) *Amelia Veray* (T.E., Tomo V, págs. 91–107) declaró, entre otras cosas, que trabajaba en el Departamento de la Vivienda y que la occisa era su jefa y compañera (T.E. pág. 92); que entre los meses de diciembre de 1975 y finales de abril o principios de mayo de 1976, pudo presenciar algunos incidentes habidos entre la occisa y el apelante en la oficina de la primera en el referido Departamento de la Vivienda (T.E. págs. 93–94); que para diciembre de 1975 el apelante insistía en que la occisa volviera con él y la amenazaba si no lo hacía; que dichas amenazas sucedían alrededor de una a dos veces en semana; que con motivo de esa situación, en dicha oficina se tomó como medida de precaución, el preparar una puerta y hacer como especie de un 'counter' que se abría la mitad de la misma y la otra mitad impedía que entraran personas (T.E. págs. 95–98); que para el mes de abril de 1976 la occisa se encontraba sentada escribiendo, llegó el apelante y la 'jamaqueó por un brazo' y le dijo que 'tenía que volver con él, que si no volvía con él, *que él la iba a matar* y que él salía bien por las conecciones (sic) que él tenía' (subrayado nuestro) (T.E. pág. 100).

La testigo de cargo *Maricela Estrada de Díaz* (T.E. Tomo V, págs. 108–134) declaró, en parte, que trabajaba en el Departamento de la Vivienda y allí conoció a la occisa; que para principios de junio de 1976 ella pudo escuchar desde su oficina, la cual era contigua a la de la occisa, una discusión entre el apelante y la occisa; que el apelante le preguntaba cuando iba a regresar a

su residencia de Guaynabo y ella le decía que no regresaría más porque ya tenía pruebas suficientes de que él tenía dos hogares y que por eso en el hogar de ella no aparecía dinero para sufragar los gastos, y que se retirara; que el apelante 'empezó a hablar en voz alta y dijo que el problema era que compañeras del trabajo le decían cosas a ellas, falsas, de las cuales ella estaba creyendo y entonces, ella le dijo que no, que ya ella tenía toda esa información [sobre los pagos de una propiedad en la Urbanización Country Club] y la había corroborado, que ella no volvería y él le dijo, "si tú no vuelves a mi casa de Guaynabo, *yo te mato,* es más, *te vuelo la tapa de los sesos,* porque yo tengo conecciones (sic) para salir bien"; (Subrayado nuestro) (T.E. pág. 114); además, declaró que la puerta del frente de la oficina de la occisa estaba condenada debido al hecho de que el apelante se 'metía allí y la amenazaba y habían habido quejas y eso era para tomar precauciones' (T.E. pág. 115)."

■ Los hechos antes expuestos arrojan la sola conclusión de que el apelante antes de efectuar el acto había ponderado, reflexionado y pensado—consciente de sus consecuencias—la muerte de la occisa, como alternativa de resolver sus problemas. El jurado, con base fundada y en el descargo fiel de su encomienda, así lo concluyó. Si alguna duda quedó en la mente de dichos juzgadores, la misma obviamente se desvaneció con la conducta del apelante, quien luego de los dos disparos, caminó como veintidós (22) pies y se acercó a la víctima, y junto a ella, se inclinó y diciendo "para acabar contigo" realizó tres (3) disparos adicionales. Véanse: *Pueblo* v. *Pacheco Baquero,* 103 D.P.R. 95 (1974); *Pueblo* v. *Dingui Ayala,* 103 D.P.R. 528 (1975); *Pueblo* v. *De León,* 102 D.P.R. 446 (1974); *Pueblo* v. *López Rodríguez,* 101 D.P.R. 897 (1974); *Pueblo* v. *Ramos Padilla,* 88 D.P.R. 384 (1963); *Pueblo* v. *Túa,* 84 D.P.R. 39 (1961). El anterior pronunciamiento hace innecesaria la discusión de un posible veredicto por Homicidio. *Pueblo* v. *Román Marrero,* 96 D.P.R. 796 (1968).

SEGUNDO: "Fue violado el derecho del acusado a un juicio justo e imparcial y al debido proceso de ley al ocultar el Minis-

terio Público declaraciones juradas en su poder, entre otras las de María Rodríguez y Herminio Rosario, en contravención a la orden de descubrimiento emitida por la sala de instancia y a la jurisprudencia de esta Honorable Superioridad."

El error gira en torno a las declaraciones juradas de los testigos de cargo María Rodríguez y Herminio Rosario. El apelante alega de que de haber contado previamente con la declaración jurada de María Rodríguez hubiese refrescado su memoria respecto al extremo de con quién conversó poco antes de los hechos imputádoles, amén de que el Ministerio Fiscal no hubiese podido impugnar su credibilidad.

Una referencia a todo el incidente resulta necesaria para concluir que no le asiste la razón y el señalamiento no tiene la importancia adjudicádale. Veamos. Terminada la presentación inicial de la prueba de cargo, el fiscal informó que renunciaba los testigos Adrián Ortiz Colón, el agente Luis Cora y Héctor L. Rosa. La defensa solicitó y el tribunal accedió a entrevistarlos. Dicho foro también ordenó que el Ministerio Público pusiera a disposición de la defensa cualquier declaración jurada prestada por el señor Adrián Ortiz, Sargento Luis Cora y ". . . además, cualquier documento que [tuviera] en su expediente, además de la declaración jurada del niño Juan Carlos Guzmán." El fiscal en corte abierta le hizo entrega a la defensa de copia de la declaración jurada del niño Juan Carlos Guzmán. (T.E., II, págs. 37–39.)

Se recesó hasta el día siguiente a petición de la defensa que desfiló su prueba, incluyendo el testimonio del apelante. Terminada la misma, el Ministerio Público presentó prueba de refutación consistente del examen directo de la testigo María Antonia Rodríguez, quien fuera contrainterrogada por la defensa luego de recibir copia de la declaración jurada prestada con anterioridad (T.E., IV, pág. 378). Al finalizar su testimonio dicha testigo fue excusada y se decretó un receso durante el fin de semana. Al reactivarse la vista del caso, la defensa planteó que el Ministerio Fiscal había incumplido la orden del tribunal y ocultado declaraciones juradas según

evidenciado al usarse como testigo a María Antonia Rodríguez (T.E., V, pág. 14). Argumentada la cuestión, la ilustrada sala de instancia determinó que la defensa tenía razón, y que habiéndose presentado el testimonio de María Antonia Rodríguez, cualquier desviación procesal había quedado subsanada. Para esclarecer la situación ordenó lo siguiente:

"Se ordena en este momento que el Fiscal entregue las declaraciones de *todos los testigos que tenga de refutación y o, inclusive, de aquellos que no piense utilizar,* pero que les haya tomado declaración jurada para que la defensa, entonces, determine si necesita alguno de ellos como testigos de defensa. *De la defensa estimar necesario que se le reabra su prueba a tenor con estas nuevas declaraciones, así lo concederemos.* Favor de entregar las declaraciones juradas." (T.E., V, pág. 13.) (Bastardillas nuestras.)

El Ministerio Fiscal cumplió a cabalidad este decreto.

Independientemente de que la cuestión no tiene el alcance atribuídole, se trataba de dos resoluciones distintas. La primera—relativa al momento en que terminó el Ministerio Fiscal de presentar su caso y renunció a varios testigos de cargo —en que a solicitud de la defensa se ordenó a los representantes del Ministerio Público que entregaran unas declaraciones juradas específicas y cualquier *otro documento* que obrara en el expediente fiscal. Y la segunda—ordenando que entregaran las declaraciones juradas de todos los testigos que tuviera de refutación, incluyendo las correspondientes a aquellas personas que no pensaban utilizar como testigos. Concluimos que la primera contemplaba documentos que no fueran declaraciones juradas, pues el juzgador estableció claras diferencias entre determinadas declaraciones juradas y otros documentos.

El incidente es uno análogo al surgido con el incumplimiento por la defensa, satisfactoriamente explicado con posterioridad, relacionado con la no entrega al Ministerio Fiscal del récord médico del apelante preparado por el Dr. William Galíndez (T.E., IV, págs. 157–170). El error no fue cometido.

TERCERO: "Erró el Honorable Tribunal al declarar culpable, y sentenciar al acusado, a pesar de que el Ministerio Público no cumplió su obligación de probar la sanidad mental del acusado, fuera de toda duda razonable."

No tiene razón el apelante. Si bien alegó incapacidad mental para cometer a conciencia el delito imputádole y presentó prueba para demostrarlo, concluimos—al igual que el jurado —que la misma no fue lo suficientemente convincente para controvertir la presunción de sanidad mental; y bajo la premisa de que creara una controversia, en su oportunidad, el Ministerio Fiscal oportunamente la esclareció. Analicemos la cuestión.

Su primer testigo pericial fue el Dr. Fernando J. Cabrera, que en lo pertinente atestó que el apelante fue su paciente desde el día 18 de agosto de 1975 en cuya ocasión le había diagnosticado una neurosis de ansiedad que podía ser leve, moderada o severa; que en su opinión, para el 30 de julio de 1976—dos (2) días después de los hechos—tenía su neurosis "más severa"; explicó que un "estado de neurosis es un estado de inquietud interna que se puede manifestar de diferentes formas, de inquietud, de temblores, de ataques de estos de inquietud, de fatiga. Se puede manifestar en cierta sistematología física, dolores de cabeza, insomnio . . . en realidad la neurosis es la expresión de la inquietud interna de un individuo, un estado de tensión." (T.E., IV, págs. 59–60).

Aclaró que era común y corriente que personas no incapacitadas mentalmente recurrieran al siquiatra por problemas matrimoniales. Señaló que el día 30 de julio de 1976 pudo hablar con el apelante y éste le manifestó que había matado a su mujer pegándole cuatro (4) tiros porque ella le había dicho una poca vergüenza y que su mente se le había ido en blanco habiéndose entregado a la policía a los diez (10) o quince (15) minutos en el cuartel de Guaynabo.(1) Recono-

---

(1) Coincidimos con el Procurador General en la siguiente observación: "Es interesante señalar que cuando el apelante declaró en el juicio,

ció casos de "simulación" y destacó que es una de las situaciones más difíciles de probar. (T.E., IV, págs. 75–76.) Este testimonio queda robustecido en el récord clínico llevado por dicho galeno, admitido como prueba, que en lo pertinente refleja lo siguiente: "Paciente solicita entrevista después de haber disparado varios tiros a su señora quien resultó muerta. Durante la conversación y entrevista no presentaba evidencia de psicosis alguna, ni ideas delirantes ni alucinaciones. Estaba ansioso. Se le receta Librium 25 mg. t.i.d., Dalmane 30 mg., 2 caps al acostarse. Diagnóstico: *Neurosis de ansiedad.*" (Bastardillas nuestras.)

▋ El estudio de dicho récord, no arroja ningún apunte o data que indique, tanto antes como depués del suceso de sangre, condición permanente, pasajera o transitoria de psicosis u otra alteración mental que impidiera al acusado comprender las consecuencias de sus actos. Repetimos, solamente demuestra un diagnóstico de neurosis de ansiedad y no controvirtió la presunción de capacidad legal. Sin embargo, cabe apuntar que el testimonio de este eminente galeno puso en entredicho las opiniones periciales de los doctores en psiquiatría William Galíndez Antello (T.E., IV, págs. 89–233) y Gerardo Sanz (T.E., IV, págs. 238–350) quienes atestaron y sostuvieron la tesis de un diagnóstico de ansiedad de reacción severa con rasgos depresivos que culminaron en una *reacción disociativa* que le impidió al apelante reconocer su acto al llevarlo a cabo. La entrevista con el apelante la realizaron el 7 de febrero de 1977; esto es, siete (7) meses después.

---

indicó que luego de que su ex-mujer había hecho determinada manifestación, no recordó nada más de lo sucedido (T.E., Tomo III, pág. 268); que cuando volvió en sí ya estaba en el Cuartel General, pasadas tres (3) o cuatro (4) horas (T.E., Tomo III, pág. 270); no recordó haberle dicho al Lic. Delíz que le había vaciado encima el revólver a su esposa (T.E., Tomo IV, 31), pero recordó haber hablado con el Lic. Delíz y el Coronel Lugo (T.E., Tomo IV, pág. 30), al igual que 'vagamente' recordó que el Lic. Delíz le hiciera las gestiones para localizar un abogado (T.E., Tomo IV, pág. 32). Todo lo anterior demostrativo de que el apelante se recordaba muy convenientemente de algunos detalles y de otros no."

La lectura del testimonio de ambos psiquiatras demuestra que éstos aceptaron implícitamente que la evaluación del Dr. Cabrera—antes e inmediatamente después de los hechos—representaba una más confiable; que el diagnóstico de neurosis disociativa estuvo basado únicamente en el relato del apelante; y que una persona podía ocultarlo o fingirlo.

Con esta perspectiva en mente, el jurado dirimió el alcance de la prueba sobre insanidad mental del apelante, y obviamente la descartó. A la luz de las circunstancias, comportamiento—antes, durante su comisión y después—coincidimos con la conclusión del Estado de que no se controvirtió la presunción de cordura.

Finalmente, aun bajo el supuesto de que se hubiese controvertido dicha presunción, el testimonio del Dr. Guillermo Santiago Santos (T.E., V, págs. 150–258) presentado por el Ministerio Fiscal estableció que el padecimiento del apelante era uno de *neurosis de angustia moderada* que no le impedía conducirse de acuerdo al mandato de ley. A tal efecto, expresó su criterio—fundado en la prueba desfilada, récords y testimonios de otros psiquiatras—que el apelante estaba simulando una amnesia cuando alegó ante su psiquiatra Dr. Cabrera que se le fue la mente en blanco. Aclaró que el comportamiento antes del apelante dar muerte y el irse a entregar después, demostraban un estado de consciencia racional y lógico.

Somos de opinión que el error no fue cometido bajo ninguna de las hipótesis fácticas y jurídicas ante nos presentadas.

CUARTO: "El estado mental del apelante, al momento de ocurrir los hechos, lo exime de la comisión del delito de asesinato en primer grado y convirtió su acto en uno de homicidio."

█ El apelante nos propone que apliquemos al caso de autos y ampliemos la norma enunciada en *Pueblo* v. *Belmonte Colón*, 106 D.P.R. 82 (1977), en que resolvimos que la incapacidad mental que puede producir el uso de drogas y bebidas alcohólicas para cambiar un designio criminal sólo

tiene el efecto de reducir el grado del delito de Asesinato en Primer Grado a Segundo. Nos pide la extendamos hasta cubrir Homicidio.

El señalamiento y súplica son inmeritorios. En el caso que nos ocupa se demostraron fuera de duda razonable los elementos de *premeditación* y *deliberación*, esto es, Asesinato en Primer Grado. No podemos, sin faltar a nuestro deber, caracterizar este crimen como un homicidio.

*Se confirmará la sentencia.*