# 2008 DTA 3

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE ARECIBO
PANEL V - SUSTITUTO**

EL PUEBLO DE PUERTO RICO
Apelado

v.

JUAN LUIS RUIZ CRUZ
Apelante

Núm. KLAN-2006-00562

San Juan, Puerto Rico, a 29 de noviembre de 2007

Panel integrado por su Presidente, el Juez Rivera Martínez,
y los Jueces Aponte Hernández y Morales Rodríguez

Morales Rodríguez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Don Víctor Chimelys Figueroa se encontraba en la casa de su hermana, en el Barrio Cordillera de Ciales, viendo grabaciones de peleas de Tito Trinidad junto al vecino del frente, don Roberto Álvarez Colón. Don Víctor se tomó dos tragos de ron y don Roberto, unas cuatro cervezas. Como a eso de las 11:45 PM, don Roberto le indicó a don Víctor que tenía que retirarse a su casa porque al otro día iba a trabajar. Don Víctor acompañó a don Roberto a su casa para despedirse de la esposa de éste como era su costumbre.

Cuando llegaron a la casa, don Roberto entró y don Víctor se quedó en una escalera en la parte de afuera del balcón. Allí estaban la esposa de don Roberto, María del Carmen Rodríguez y su hermana, Oneida Rodríguez Nieves; también estaba una amiga de doña Oneida, Norma Pagán, y el esposo de doña Oneida, Diego Luis Delgado Febus. Don Víctor permaneció en la parte de afuera de la casa. Hablaba con doña Oneida. Cuando don Roberto entró a la casa, su esposa le ofreció café. Se fue a tomárselo en la sala. En la sala también se encontraba doña Norma. En eso, doña Oneida, que estaba en la escalera del balcón con don Víctor, dijo: *"Norma, ahí llegó Güiso"*. Se refería a Juan Luis Ruiz Cruz. Doña Norma salió. Se dirigió hasta el otro extremo de la calle donde se encontraba Ruiz Cruz. Entre éste y doña Norma existía una relación consensual, a pesar de que él estaba casado con otra persona.

Cuando doña Norma llegó hasta el carro de Ruiz Cruz, éste se bajó. Caminó hacia ella. Ella se cayó al piso. No sabemos cómo. A pesar de que don Víctor no conocía a doña Norma ni a Ruiz Cruz, al ver esa caída, cruzó la calle y llegó específicamente a la parte·frontal del carro. Los dos hombres hablaron. Doña Oneida y don Roberto se encontraban en el balcón de la casa, y no alcanzaron a escuchar lo que éstos se dijeron. Entonces Ruiz Cruz,

quien era policía estatal adscrito al cuartel de Ciales, sacó su arma de reglamento. Le apuntó a don Víctor. Éste levantó sus brazos. Retrocedió y se inclinó hacia el frente. Aún así, Ruiz Cruz le disparó. Don Víctor se movió hacia el frente del carro y Ruiz Cruz lo siguió. Le disparó tres veces más. Dos balas le penetraron por la espalda.

Entonces, Ruiz Cruz se dirigió hacia doña Norma, quien aún permanecía en el suelo. Le hizo dos disparos, uno en el codo y otro en el abdomen. Doña Norma se levantó. Caminó hacia el otro lado de la carretera, frente a la casa de don Roberto. Ruiz Cruz siguió caminando hacia ella. Le volvió a apuntar con el arma, pero ya no disparó más. Luego se dirigió hacia su carro y se quedó observando al occiso.

En esos instantes pasaba el Capellán de la Policía Municipal de Ciales, Demetrio García Noriega, por la carretera 146 en el Barrio Cordillera. Al percatarse de que había un cuerpo tirado en el suelo, al ver a Ruiz Cruz parado al lado observándolo, y al ver a una mujer ensangrentada, decidió detenerse. El capellán se bajó del carro. Ruiz Cruz caminó hacia él. El capellán le preguntó sobre lo que había sucedido. Éste le respondió: *"Fui, fui yo y me voy a entregar al cuartel de Ciales"*. El capellán no percibió que Ruiz Cruz expeliera olor a alcohol. Inmediatamente después, Ruiz se montó en su vehículo y se marchó del lugar. El capellán fue a examinar a don Víctor, y a doña Norma. Ella le dijo: *"fue Ruiz, fue Ruiz, fue Ruiz"*. El capellán trasmitió a través de un radio de comunicaciones de la Policía un mensaje. Informó que había una persona muerta y otra herida y solicitó los servicios de una ambulancia. Cuando volvió, doña Norma le dijo: *"el policía disparó"*.

En eso llegó la Policía de Manatí, la de Ciales y la Policía Municipal a investigar lo sucedido. Entre otros, estaba el sargento Miguel A. Rosario Ortiz. El capellán le informó al sargento Rosario lo que él conocía. Ante dicha información, el oficial se comunicó por radio con el cuartel de Ciales. Informó al retén José Sánchez Méndez, que había un compañero involucrado en el incidente del Barrio Cordillera; que éste se dirigía hacia el cuartel; que le diera custodia. Minutos después llegó al cuartel Ruiz Cruz en su vehículo. Se estacionó y se bajó cabizbajo. Cuando el retén Sánchez lo vio le dijo *"No me digas que fuiste tú"*. Caminó hacia el cuartel. Sacó su arma de reglamento del bolsillo derecho. La descargó y la entregó al retén Sánchez junto con seis casquillos vacíos. El retén Sánchez no percibió que su compañero oliera a alcohol. Le preguntó si quería hacer una llamada y éste procedió a dictarle un número telefónico.

Con posterioridad, el Sargento Juan J. Negrón Galarza, por órdenes del sargento Rosario, buscó a Ruiz al cuartel de Ciales para trasladarlo al cuartel de Manatí como medida de seguridad. Durante todo el viaje, Ruiz Cruz permaneció callado. Esa misma madrugada, el agente Alejandro Montalvo Argüelles de la División de Homicidios de Arecibo, fue encargado de investigar los hechos. Luego de entrevistar a los testigos y la escena, fue hasta el cuartel de Manatí a entrevistar a Ruiz Cruz. Tampoco percibió que oliera a alcohol. Lo entrevistó y lo trasladó a la Comandancia de Arecibo. Al ser ingresado a la celda en el cuartel, le preguntó cómo se sentía. El acusado expresó estar bien. Le examinó su condición y aspecto físico. No surgió que tuviera algún golpe en la cara, ni en las manos ni nada indicativo de que hubiese sido golpeado en alguna parte del cuerpo.

El Ministerio Público formuló acusación por asesinato en primer grado bajo el antiguo Código Penal. El caso se vio ante Jurado. El Tribunal, antes de que el Jurado se retirara a deliberar, emitió una serie de instrucciones. Tanto el Ministerio Público como la Defensa expresaron estar satisfechos con las instrucciones impartidas. No objetaron ni solicitaron instrucciones adicionales. El Jurado, luego de evaluar la prueba, rindió veredicto de culpabilidad contra Ruiz Cruz por el delito de asesinato en primer grado. Ante el veredicto rendido, el Tribunal de Primera Instancia dictó sentencia condenándolo a cumplir una pena de 99 años de reclusión.

Inconforme, Ruiz Cruz recurre ante nosotros. Señala: (1) que se cometió error al declararle culpable del delito de asesinato en primer grado ante ausencia de prueba de premeditación y deliberación, cuando la muerte del occiso ocurrió en ocasión de arrebato de cólera en reacción a una agresión física del perjudicado y estando ambos en estado de embriaguez; (2) que se cometió error de derecho al dar instrucciones al Jurado sobre asesinato en primer grado, ya que la prueba presentada no justificaba dicho delito y sí uno de homicidio; (3) que se cometió

error de derecho al omitir dar instrucciones o explicaciones claras o adecuadas al Jurado sobre los elementos inferiores al delito imputado o comprendidos dentro de éste y sobre los elementos esenciales de las defensas sometidas por el acusado, así como los puntos de derecho que bajo cualquier teoría razonable pudieran estar presentes en las deliberaciones del Jurado, y que no se esclarecieron sus dudas, cuando éste las planteó en cuanto a las diferencias existentes entre los delitos de asesinato en primer y segundo grado y el homicidio involuntario; (4) que se cometió error al permitir que se contaminara el Jurado cuando se autorizó la entrada a sala de personas portando camisetas con la foto del occiso y grupos de menores de las escuelas donde trabajaba el perjudicado con el ánimo de influir y al permitir que el Jurado se contaminara con publicidad excesiva; (5) que se cometió error de derecho al no permitírsele a los abogados de Defensa hacer preguntas durante el interrogatorio y contrainterrogatorio del policía que entrevistó inicialmente a los testigos en la escena del incidente, sobre el contenido de las notas tomadas por éste, debido a una objeción del Ministerio Público.

Procedemos a resolver.

# I

Aplica a este caso el Código Penal de Puerto Rico de 1974. Éste definía asesinato como dar muerte a un ser humano con malicia premeditada. Artículo 82 del Código Penal de Puerto Rico, 33 L.P.R.A., sec. 4001. Ha explicado nuestro más alto foro judicial en *Pueblo v. Rivera Alicea*, 125 D.P.R. 37, 45 (1989):

*"El concepto de malicia premeditada implica la ausencia de justa causa o excusa al ocasionar la muerte e implica, además, la existencia de la intención de ocasionar la muerte de un semejante. (...) La intención de ocasionar la muerte se puede manifestar al realizar un acto o al producir un grave daño corporal, cuya consecuencia probable sea la muerte de la persona. Por ello, la malicia premeditada debe ser determinada a base de los hechos, los actos y las circunstancias que rodean la muerte, la capacidad mental, la motivación, las manifestaciones y la conducta del acusado."*

Nuestros legisladores clasificaron el delito de asesinato por grados dependiendo la forma, severidad o perversidad con que una persona lleva a cabo el acto delictivo. El Artículo 83 del Código Penal de 1974, 33 L. P.R.A., sec. 4002, en lo pertinente, indica que constituye asesinato en primer grado toda clase de muerte alevosa, deliberada y premeditada. Nuestro más alto foro ha explicitado que la diferencia entre el asesinato en primer grado y el segundo grado es el elemento de la deliberación. En *Pueblo v. Torres Montañez*, 106 D.P.R. 125, 129 (1977), el Tribunal Supremo pautó que la deliberación es *"la resolución de matar, después de darle alguna consideración"* y que:

*"[C]ualquier período de tiempo es suficiente para que pueda tener lugar la deliberación. Este lapso, sostienen las autoridades, puede ser tan rápido como el pensamiento mismo. (...) La malicia premeditada y aun la deliberación pueden concebirse en el momento mismo de la realización del ataque."*

En *Pueblo v. Negrón Ayala*, resuelto el 1 de junio de 2007, **2007 JTS 109**, 171 D.P.R. ___ (2007), reiteró el Tribunal Supremo que *"tanto la deliberación como la malicia premeditada no requieren necesariamente de un plan previo ni que se conciban con mucho tiempo de antelación a los hechos"*. También expresó que *"la premeditación [y la deliberación] puede[n] formarse en un instante antes del acto, y puede[n] existir... no obstante la rapidez con que el acto se haya realizado."* Por último trajo a la atención varias instancias donde la jurisprudencia ha reconocido la existencia de malicia premeditada y deliberación:

*"Cónsono con lo anterior,* **este Tribunal ha reconocido varias instancias en las que fácilmente se puede inferir la malicia premeditada y/o la deliberación.** *A modo de ejemplo, podemos señalar:* **el acto de atacar a una persona con una arma mortífera, ya que, del uso de la misma, puede inferirse la intención de matar o causar daños cuya consecuencia probable es la muerte; atacar con una arma a una persona desarmada; dispararle a la víctima en más de una ocasión, a corta distancia** *y alcanzándola en la cara;* **dispararle a la**

*víctima dos tiros con un arma de fuego y luego acercársele para dispararle tres veces más* mientras le dice *"para acabar contigo"; ultimar a balazos a la víctima luego de que ésta retrocediera y rogara para que no le disparara;* **cuando sin mediar palabras, el acusado le dispara a unos jóvenes y mata a uno de ellos;** *cuando sin mediar palabras, el acusado le dispara tres tiros a un policía que le ordenó detenerse; inferirle numerosas heridas punzantes a la víctima atacándola por la espalda; apuñalar al occiso mientras otro lo agarra".* (Énfasis nuestro)

En *Pueblo v. Torres Montañez, supra,* a la pág. 130, se volvió a subrayar lo resuelto en *Pueblo v. Merced Jiménez,* 100 D.P.R. 270, 281 (1971), en cuanto a que *"la presencia o ausencia de deliberación es una cuestión de hecho a ser resuelta por el Jurado".*

Plantea Ruiz Cruz que el Tribunal de Primera Instancia erró al declararlo culpable del delito de asesinato en primer grado ante ausencia de prueba de premeditación y deliberación. Alega insuficiencia de prueba que justificara dicha convicción; que la muerte del occiso ocurrió en ocasión de arrebato de cólera ante agresión física del perjudicado y estando ambos en estado de embriaguez.

Hemos examinado cuidadosamente la voluminosa transcripción de este caso. Doña Oneida y don Roberto, testigos oculares de los hechos, indicaron que cuando don Víctor fue hasta el carro de Ruiz Cruz, éstos hablaron por un breve instante; que acto seguido Ruiz sacó su arma de reglamento y le apuntó a don Víctor, el cual se encontraba desarmado; que don Víctor empezó a retroceder con sus brazos levantados y que aún así Ruiz le disparó; que, ya herido, don Víctor se movió para el frente del carro y Ruiz lo siguió y le disparó tres veces más por la espalda hasta rematarlo.

Como hemos visto, no existe un requisito de tiempo para que se de la deliberación. Ésta puede darse en un lapso de tiempo corto y rápido e incluso puede formarse en el instante mismo del acto delictivo. Ruiz Cruz sacó el arma y le apuntó a don Víctor. Después, mientras don Víctor, desarmado retrocedía con sus brazos levantados, Ruiz Cruz le disparó. Ese tiempo era suficiente para meditar y deliberar un asesinato. Pero, aún después, Ruiz Cruz siguió a don Víctor para rematarlo por la espalda. Le disparó tres tiros más. Meditó y deliberó otra vez. Los hechos de este caso concuerdan con las instancias en que la jurisprudencia ha inferido premeditación y deliberación. *Pueblo v. Negrón Ayala, supra.*

Ruiz Cruz alega que la muerte del occiso ocurrió en ocasión de arrebato de cólera ante una agresión física del perjudicado mientras ambos estaban en estado de embriaguez. El Artículo 85 del Código Penal de Puerto Rico del 1974, 33 L.P.R.A., sec. 4004, indica que el homicidio se configura cuando una persona ocasiona la muerte a otra en ocasión de súbita pendencia o arrebato de cólera. Los elementos del delito son: 1) dar muerte a un ser humano, 2) como consecuencia de una pendencia súbita o de un arrebato de cólera, 3) causado por una provocación adecuada de parte de la víctima. *Pueblo v. Rivera Alicea, supra,* a la pág. 46.

En este caso, la evidencia testifical presentada por la Defensa para sustentar el elemento de provocación por parte de la víctima palideció frente a la del Ministerio Fiscal. Testificó el Agente Alejandro Montalvo Argüeyes de la División de Homicidios de Arecibo, quien estaba encargado de la investigación lo siguiente:

*"P ¿Cuál es, cuál es el procedimiento, desde el punto de vista de la policía, para ingresar a una persona detenida en la celda del Cuartel?*

*R El procedimiento es entrar a la persona a un libro que hay, de detenidos, de las personas que están en la celda. Antes de entrar a la persona, preguntarle cuál es su estado, si tiene algún golpe, si está bien de salud.*

*P ¿Por qué se hace eso?*

R Porque si la persona tiene algún golpe o, o se siente enfermo, pues es obligatorio nosotros requerir que un médico lo vea y llevarlo a un hospital, o llamar a una ambulancia para que lo atienda.

P ¿Y en este caso usted lo hizo?

R Es correcto, sí, señor.

P ¿Y que expresó entonces el acusado?

R No, que estaba bien.

P Usted, aparte de él decir que estaba bien de salud, ¿usted examinó al acusado, a ver cómo era su condición física, su aspecto físico?

R Sí, él estaba normal, no tenía, yo no le observé ningún golpe en la cara, ni en las manos, nada que, que me sugiriera a mí que él, que él tuviera un golpe.

El testigo de la Defensa, Sargento Miguel A. Rosario Ortiz, declaró por primera vez en el juicio, que el acusado le había indicado que don Víctor le había dado un puño. Pero fue impugnado por el Ministerio Público. Veamos:

P Entonces, oiga, usted le dice a las damas y caballeros del Jurado que el acusado, y que el, que el, que el occiso, el que resultó muerto en este caso, le dio un puño al acusado que lo tiró encima del baúl. Eso fue lo que usted declaró aquí horita, ¿es correcto?

R Eso me indicó él.

P ¿Eso fue lo que usted dice que él le dijo? La foto del baúl del carro, Exhibit C-4. ¿Usted ve alguna abolladura ahí?

Lcdo. José A. Rubio Pitre:

Juez, ¿podemos ver la fotografía? Fiscal.

Fiscal Obdulio Meléndez Ramos:

P ¿Usted ve algún foco roto o alguna abolladura ahí? ¿Sí o no?

Testigo:

R A simple vista, no.

El sargento Juan J. Negrón Galarza, testigo de Defensa, se contradijo durante el contrainterrogatorio, en su testimonio sobre agresión:

Fiscal Obdulio Meléndez Ramos:

P Mire, la última pregunta que le voy a hacer. ¿Y usted, cuando lleva al acusado a la celda de Manatí, no le vio ningún golpe al acusado?

*Testigo:*

*R No me...*

*P No le vio ningún golpe.*

*R ... (ininteligible)*

*P ¿Qué qué?*

*R No le recuerdo haberle, este visto golpe alguno.*

*P Oiga, mire a ver, ¿si el procedimiento es que si usted lo ve un golpe, tiene que llevarlo a curar antes de ingresarlo?*

*R Eso es así.*

*P ¿Eso es correcto?*

*R Eso es así.*

*P ¿Y usted lo ingresó en la celda?*

*R Lo ingresé.*

*P ¿Debemos entender que no le vio ningún golpe?*

*R Ninguno."*

Por último, el testigo de refutación del Ministerio Público, Teniente Humberto Angleró Medina, a preguntas del fiscal indicó que *"lo primero que nosotros corroboramos, y lo que debe hacer todo Agente, pues, es corroborar la condición física de la persona, si está golpeado, si tiene algún hematoma o algún..."* y que *"en este caso se hizo y la persona no tenía nada de eso"*.

No podemos olvidar que Ruiz Cruz era un agente de la policía, capacitado para el manejo de situaciones peligrosas, de alta aprehensión y para controlar su carácter. Ante una situación de enfrentamiento o provocación, si es que la hubiese habido, Ruiz Cruz sabía cuál era la reacción apropiada y las condiciones que justificaban el uso del arma de reglamento. Su decisión, sin embargo, fue abusar del poder que le daba el arma que tenía consigo para matar a un ser humano que no estaba armado, que estaba sometido según la prueba desfilada. El arma de reglamento estaba allí con el único propósito lícito de defender a la población, con mesura, en situaciones de riesgo a la vida.

Ruiz Cruz, por último, alega que no se configuró el asesinato en primer grado por estar tanto la víctima como él en estado de embriaguez. El Artículo 33 del Código Penal de Puerto Rico de 1974, 33 L.P.R.A., sec. 3155, dispone:

*"La voluntaria embriaguez o la voluntaria intoxicación por drogas, sustancias narcóticas, estimulantes o deprimentes, o sustancias similares, no exime de responsabilidad criminal. Pero siempre que la existencia real de algún fin, motivo o intención determinados, fuere elemento indispensable para constituir alguna clase o grado de delito especial, el juzgador podrá tomar en consideración el hecho de que el acusado se hallaba*

*entonces ebrio o intoxicado, al determinar el fin, motivo o intención con que cometió el delito."*

La jurisprudencia ha explicado los contornos y límites de esta norma. En *Pueblo v. Méndez Ramos*, 108 D. P.R. 59, 62 (1978), se validó como aplicable al Artículo 33, la interpretación dada en *Pueblo v. Rivera*, 70 D.P. R. 570, 573-574 (1949), al Artículo 41 del Código Penal de 1937. Nuestro más alto foro reiteró que: *"la embriaguez -voluntaria- tiene que ser de tal grado o carácter que inhiba en el acusado su facultad mental para formar la intención específica requerida por el Código para la convicción de un delito -o grado del mismo-, en el cual se requiera tal intención específica, y que la determinación de ese hecho es esencialmente una para el Jurado o la corte juzgadora"*. En ese mismo caso se indicó que la *"mera prueba de embriaguez no es suficiente para exonerar, ni para rebajar la calificación del delito"*.

La incapacidad mental producida por el uso voluntario de drogas o alcohol puede tener el efecto de reducir el grado del delito. *Pueblo v. Belmonte Colón*, 106 D.P.R. 82, 88 (1977); *Pueblo v. Guzmán Toro*, 107 D.P.R. 700, 710-711 (1978). No obstante, se ha rechazado que la embriaguez voluntaria o la intoxicación de drogas tenga el efecto de rebajar de un delito de asesinato de primer grado a uno de homicidio. D. Nevares-Muñiz, *Derecho Penal Puertorriqueño Parte Genera*, 4ta Edición, Hato Rey, Puerto Rico, Instituto para el Desarrollo del Derecho, Inc., 2000, pág. 318.

En el presente caso, la prueba de embriaguez presentada fue rebatida enérgicamente por el Ministerio Público. El primer testigo de Defensa que declaró sobre el asunto fue el sargento Juan J. Negrón Galarza. A preguntas de la Defensa éste indicó: *"como la patrulla iba con aire acondicionado, de momento me daba olor a licor. A pesar de que él no comentó nada, quizás cuando respiraba; pero que entendí que había hecho uso de, de bebidas embriagantes, que estaba bebido"*. En el contrainterrogatorio ese testimonio fue impugnado:

*"P Más o menos. Incluso, hace un mes más o menos atrás, mire a ver si lo que usted declaró fue: "Me parecía que había bebido un poco", mire a ver.*

*R Sí, yo lo dije.*

*P No, no, no, ¿Qué si usted lo que, hace un mes atrás declaró, en esa declaración jurada, es: Me parecía que había bebido un poco"? ¿Es correcto?*

*R Eso está así en la declaración jurada.*

*P Eso está así en la declaración jurada. ¿Expelía un poco de olor a alcohol, mire a ver si eso está así, también?*

*R Declaré que expelía un fuerte olor...*

*P ¿Qué si dice: "Expelía un poco de olor a alcohol"? Mire a ver si eso está así también.*

*R Declaré que expelía un poco...*

*P ¿Qué, que si dice: "Expelía un poco de olor a alcohol", mire a ver si eso está así también en la declaración?*

*R Si, porque mientras era transportado...*

*P Que, pero, ¿Qué si eso está aquí, también?*

R Está así, sí.

P ¿Está así?

R Está así.

P Mire a ver si le preguntaron: "¿Algún otro signo...algún otro signo que indicara que el acusado había bebido esa noche?", y usted dijo: "Ningún otro".

R Y así está... (Ininteligible)

P ¿Y así está en la declaración, bajo juramento?

R Así está."

Otro de los testigos de la Defensa sobre el uso de bebidas embriagantes fue el agente José E. González Rivera. Declaró que luego de salir de trabajar a las 12:00 del mediodía, él se detuvo en un negocio de Manatí llamado "*El Fisgón*". En dicho lugar se encontró con Ruiz Cruz. Compartió con él alrededor de cuarenta minutos. Indicó que cada uno se tomó dos cervezas. No obstante, cuando la Defensa le preguntó "*¿si usted había notado, por la experiencia que usted tiene en la Policía de Puerto Rico, si Juan estaba tomado?*", él testigo contestó que "*No, él, yo lo vi normal*".

El último testigo de Defensa que declaró sobre la embriaguez de Ruiz Cruz fue el agente Luis A. Santiago Santiago. Testificó que cuando él fue a buscarlo al negocio que está al frente de la casa, éste llegó como a las 4:00 PM bastante tomado. En dicho negocio continuaron bebiendo. Cada uno se dio como siete cervezas. Ambos se fueron del negocio como a las 6:00 PM. Se dirigieron hacia la casa de Ruiz Cruz para recibir una charla sobre finanzas. Éste guió así bebido y, cuando llegaron a la casa, —según esta versión—, continuó bebiendo cerveza. Luego de la charla sirvió comida a las personas presentes. Ruiz Cruz también comió, aunque no mucho. El agente Santiago indicó que permaneció en esa casa como hasta las 10:00 PM.

En el contrainterrogatorio realizado por el Ministerio Público salió a relucir que ésta era la primera vez que el testigo declaraba sobre el estado de embriaguez de Ruiz Cruz. Que el testigo nunca había hecho comentario alguno a los fiscales del caso sobre el asunto.

La prueba de la Defensa ya citada junto a la del Ministerio Público contradijo este testimonio. El capellán declaró que cuando saludó, abrazó y habló con Ruiz Cruz en el lugar de los hechos, no notó o percibió ningún olor a bebida alcohólica. El retén Sánchez Méndez testificó que mientras Ruiz Cruz estuvo en el Cuartel de Ciales, no percibió ningún olor a alcohol que emanara del acusado. El agente Montalvo indicó que mientras él entrevistó a Ruiz Cruz en el cuartel de Manatí no percibió que el acusado expeliera olor a alcohol. El teniente Humberto Anglero Medina, quien estuvo en contacto con el acusado desde el cuartel de Manatí hasta el cuartel de Arecibo, indicó que en ningún momento de la madrugada percibió que el acusado expeliera olor a alcohol.

En adición, el Ministerio Público, en su turno de preguntas a su perito, doctor Raúl E. López Menéndez, hizo un recuento de las actuaciones llevadas a cabo por Ruiz Cruz aquella noche: guiar un vehículo de motor; reconocer a su compañera; disparar a una distancia de alrededor de seis pies y acertar el primer disparo; luego seguir a la víctima y volver a disparar tres veces más y acertar dos disparos; ir donde la compañera que se encontraba en el piso y hacer dos disparos más; luego, cuando ella huye, perseguirla y apuntarle nuevamente con el arma; luego se vuelve a dirigir al cuerpo de su víctima; estando allí se le acercó a una persona y se abraza a esa persona; dialoga con él; admite que "*Fui yo, y voy al Cuartel a entregarme*"; se monta en su vehículo; da reversa; le pasa por el lado al occiso; se dirige al cuartel de la Policía; en el cuartel se dirige al retén; saca su

arma; la descarga; la entrega; recuerda de memoria un número telefónico. Luego del relato, el Ministerio le preguntó a su perito que si las actuaciones antes indicadas son compatibles con el grado de intoxicación que pueda tener una persona que le inhiba su capacidad de formular y tener la intención de matar. El perito contestó que dichas actuaciones no son compatibles con una persona con un grado de intoxicación que inhiba su capacidad mental de formar una intención de matar. Además, concluyó dicho perito que:

*"Toda la evidencia que fue revisada sobre los testigos que estuvieron allí y lo vieron actuar, apuntan inequívocamente a que esta persona se encontraba en pleno dominio y en pleno acceso a sus facultades mentales; que para no poder formar una intención tendría que tener un grado de intoxicación que hubiese sido notado por los testigos y que hubiese sido incompatible con las acciones que él ha, que él... que él ha delimitado, que son acciones finas, que requieren acceso de la orientación "viso-especial", y en el estado severo de intoxicación, en el cual no se puede formar una intención, es prácticamente imposible que esta persona haya podido llevar a cabo tantas acciones que son muy delicadas y muy finas y a la misma vez estuviese intoxicado a un grado de que no pudiese pensar y formar sus intenciones"."*

Si concluyéramos que la prueba demostró que Ruiz Cruz ingirió bebidas alcohólicas el día de los hechos — lo cual no podemos hacer por no haber nosotros observado los testigos para dirimir credibilidad—, está muy claro que dicha ingesta no fue del grado contemplado por el Código y la doctrina citada. No podemos catalogar su estado como de tal grado de haberle inhibido de su facultad mental para formar la intención específica de matar, como lo requiere el Artículo 33 del Código Penal, *supra*.

Pero, ante la prueba antes transcrita, nos corresponde aplicar el principio cardinal de que la apreciación de la prueba le corresponde al Jurado. Ante la ausencia de error manifiesto, pasión, prejuicio o parcialidad en la apreciación de la prueba, *Pueblo v. Maisonave Rodríguez,* 129 D.P.R. 49, 62-63 (1991), este foro mantiene la conclusión del Tribunal de Primera Instancia. El Ministerio Público probó todos los elementos del delito de un asesinato en primer grado. En consecuencia, el Tribunal de Primera Instancia no erró en hallar culpable a Ruiz Cruz del delito imputado.

## II

Ruiz Cruz, en su alegato ante nosotros, señala la comisión de error en las instrucciones al Jurado.

En todo proceso que se lleve a cabo ante Jurado, el Tribunal deberá impartir instrucciones haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho que sean necesarias para la información del Jurado. Regla 137 de Procedimiento Criminal, 34 L.P.R.A. § Ap. II, R. 137. Estas instrucciones deberán ser claras, precisas y lógicas. Dependerán de los hechos particulares del caso en cuestión y las defensas que se presenten. *Pueblo v. Acevedo Estrada,* 150 D.P.R. 84, 95 (2000).

Se ha señalado que nuestro ordenamiento jurídico tiene como principio rector que las instrucciones al Jurado deben alcanzar, si la prueba lo justifica, los elementos de delitos inferiores al delito imputado o comprendido dentro de éste; también los elementos esenciales de las defensas señaladas por el acusado; los puntos de derecho que bajo cualquier teoría razonable puedan estar presentes en las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo v. González Colón,* 110 D.P.R. 812, 815 (1981). Pero la revocación de una convicción procede cuando el error al omitir o al impartir la instrucción en controversia es de tal naturaleza que de no haberse cometido, probablemente el resultado del juicio hubiera sido distinto o cuando se violan los derechos fundamentales o sustanciales del acusado. *Pueblo v. Acevedo Estrada, supra,* pág. 96. Para ello es necesario que se haga el correspondiente planteamiento ante el foro apelado. *Pueblo v. Sánchez Torres,* 102 D.P.R. 499, 504 (1974).

Ruiz Cruz alega que el Tribunal apelado erró al dar instrucciones sobre asesinato en primer grado, ya que la prueba presentada no justificaba dicho delito y sí uno de homicidio. Según ya hemos visto, el Ministerio

Público presentó evidencia contundente de que Ruiz Cruz mató y remató a don Víctor; que en dicha actuación delictiva medió premeditación y deliberación. Ante la existencia de prueba sobre el delito imputado, el Tribunal de Primera Instancia actuó correctamente al impartir una instrucción sobre dicho delito. Según la norma esbozada, el único requisito que se necesita para que le Tribunal imparta una instrucción de un delito es que la prueba presentada lo justifique, y en este caso, la prueba lo justificaba.

De una lectura a las instrucciones impartidas podemos ver con claridad que cuando el magistrado dio la instrucción de asesinato en primer grado, la Defensa no opuso objeción alguna. La Regla 137 de Procedimiento Criminal de Puerto Rico, *supra*, indica, en lo pertinente, que *"Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisiones en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el Jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud"*.

Según se desprende de la transcripción, la Defensa solicitó por escrito una instrucción especial sobre el delito de Asesinato y sobre la embriaguez o intoxicación voluntaria. El Juez la denegó y la Defensa no pidió reconsideración, allanándose así al dictamen del Tribunal. Cuando el Juez impartió la instrucción de asesinato en primer grado, la Defensa tampoco objetó. Está impedida de alegar como error una instrucción que no objetó o impugnó. Por lo tanto, no erró el Tribunal.

Ruiz Cruz también plantea que erró el Tribunal de Primera Instancia al omitir instrucciones y explicaciones claras o adecuadas sobre los elementos inferiores al delito imputado y sobre los elementos esenciales de las defensas señaladas por el acusado; que omitió explicar los puntos de derecho que bajo cualquier teoría razonable puedan estar presentes en las deliberaciones del Jurado; que omitió contestar dudas, cuando el Jurado lo solicitó, en cuanto a las diferencias existentes entre los delitos de asesinato en primer y segundo grado y homicidio involuntario.

Las instrucciones brindadas incluyeron, entre otras, el delito imputado como los delitos menores incluidos: en este caso Asesinato en Segundo Grado y Homicidio. El magistrado no se ciñó a indicar los delitos, sino que explicó y definió los conceptos y elementos que los componen. También explicó las diferencias existentes entre éstos. El Tribunal también impartió instrucción sobre la defensa de embriaguez o intoxicación voluntaria y lo que implica dicha defensa. La transcripción del juicio refleja que la alegación de que el Tribunal no impartió instrucciones adecuadas no se sostiene con hechos.

Ninguna parte de la transcripción refleja que la Defensa haya objetado o impugnado las instrucciones brindadas. Todo lo contrario. La Defensa expresó estar conforme con éstas:

*"Juez:*
*Le voy a... le pregunto a las partes ahora si hay alguna excepción a las... a las instrucciones, tal y como han sido impartidas.*

*Fiscal Obdulio Meléndez Ramos:*
*Por nuestra parte, ninguna, Juez.*

*Juez:*
*¿Compañeros?*

*Lcdo. José A. Rubio Pitre:*
*Por nuestra parte, ninguna, Juez, ninguna. "*

El Tribunal de instancia aclaró las dudas que tenía el Jurado en cuanto a las diferencias existentes entre los

delitos de Asesinato en Primer y Segundo Grado y de Homicidio Involuntario. El Jurado expresó estar claro con la explicación brindada. Y también las partes del caso:

*"Presidente del Jurado:*
*Estamos claros, Juez, en las definiciones.*

*Juez:*
*¿Tiene alguna pregunta, alguna duda en cuanto a los que ustedes pidieron que se aclarara? Les he leído lo que dice, lo que leímos de Asesinato en Primer Grado, que ustedes me pidieron; Asesinato en Segundo Grado y Homicidio. Absolución, que usted pidió. Si ustedes consideran que ninguno de esos tres delitos estuvo presente, pues el veredicto sería el de absolución. ¿Estamos? ¿Algo más que entiendan que quieren aclarar, señor Presidente del Jurado?*

*Presidente del Jurado:*
*Bueno, en el caso mío, no. No se si mis compañeros.*

*Juez:*
*No, no, pero usted es... usted, ahora es usted... usted me dice, que usted es el que...*

*Presidente del Jurado:*
*No.*

*Juez:*
*De tener ustedes alguna duda o algo que quieran que se les explique, pueden volver a solicitar cualquier explicación que entiendan, ¿estamos? Está bien. Bien.*

*Lcdo. José A. Rubio Pitre:*
*La Defensa está satisfecha, su Señoría, con las explicaciones vertidas.*

*Juez:*
*Sí, se pueden retirar.*

*Alguacil:*
*De pie todos, por favor.*

*Alguacil:*
*De pie todos. Pueden sentarse.*

*Juez:*
*Miren, se me hizo una... se me hizo una observación a los efectos... cuando estaba leyendo lo que dispone la Regla y le voy a leer lo que dice. Se le... dos veces "pensar y pensar". Dice: "El término deliberada se refiere a la decisión formada o concebida como resultado de pensar y pensar", es lo que dice, "cuidosamente las consideraciones en pro y en contra del propuesto curso de acción". Es para aclararle eso que había dicho "pensar y pensar", y es "pensar y pensar el... cuidadosamente las consideraciones en pro y en contra del curso de acción". Acla... con esa aclaración, pues...*

*Lcdo. José A. Rubio Pitre:*
*Habíamos consignado, su Señoría, que la Defensa estaba de acuerdo con las instrucciones que impartió su Señoría a las damas y caballeros del jurado."*

Ante la indiscutible satisfacción y la falta de objeción o impugnación a las instrucciones y explicaciones impartidas, es de aplicación la Regla 137 de Procedimiento Criminal de Puerto Rico, *supra*. Los errores señalados no fueron cometidos.

## III

En su alegato, Ruiz Cruz también plantea que se cometió error al permitir que se contaminara el Jurado; que el tribunal impugnado permitió la entrada a sala de personas portando camisetas con la foto del occiso y de grupos de menores de las escuelas donde trabajaba con el ánimo de influir en el veredicto. Alega además que permitió que el Jurado se contaminara con publicidad excesiva.

De la extensa transcripción del juicio en su fondo no surge que en momento alguno durante el juicio se hubiese suscitado algún incidente como el descrito. La Defensa nunca objetó, impugnó o solicitó remedio alguno ante el Tribunal de Instancia sobre esos asuntos. Ante la ausencia en el expediente de los hechos señalados y el indiscutible silencio de la Defensa ante el Tribunal de Instancia sobre el tema, ella está impedida de señalarnos el error. Estamos desprovistos de prueba alguna para resolver una situación que, o no ocurrió o si ocurrió, no fue sometida en primera instancia.

Es norma reiterada tanto en el derecho penal como en el civil que un apelante no puede elevar, por primera vez en apelación, un error que no fue sometido al Tribunal de Primera Instancia. *Trabal Morales v. Ruiz Rodríguez*, 125 D.P.R. 340, 351 (1990).

Surge de las instrucciones al Jurado, sin embargo, que el magistrado tomó la precaución de advertir sobre el efecto de una posible publicidad excesiva. Veamos:

*"El... advertencia sobre pu... sobre... al Jurado sobre publicidad. El Jurado deberá rendir es... decidir este caso únicamente a base de la evidencia presentada en el Tribunal. Ustedes deberán descartar totalmente y no considerar cualquier informe de prensa, televisión o radio que puedan haber leído o visto o escuchado. Tales informes no constituyen evidencia y, por lo tanto, ustedes no pueden considerar ni dejarse influenciar en manera alguna por tal publicidad. Ello resulta altamente impropio, por lo que se les instruye a que se abstengan de cualquier discusión ulterior sobre el particular. Es irrazonable considerar tales informes por la misma circunstancia de que no constituyen prueba, toda vez que no ha habido la oportunidad de constatar o probar los mismos, su certeza o, de alguna manera, explicarlos."*

De haber existido la referida publicidad, cosa que no surge del expediente, ésta fue subsanada con esa instrucción brindada al Jurado. Por lo tanto, los señalados errores no fueron cometidos.

## IV

Por último, Ruiz Cruz señala que se cometió error de derecho al no permitírsele a los abogados de Defensa hacer preguntas —durante el interrogatorio y contrainterrogatorio del Policía que entrevistó inicialmente a los testigos en la escena del incidente—, sobre el contenido de las notas tomadas, ante una objeción sometida por el Ministerio Público.

De la declaración del testigo Víctor Castro Miranda surge que la Defensa, en su turno, preguntó sobre el contenido de las notas tomadas por dicho agente. También surge que la razón por la cual la Defensa no pudo continuar preguntando sobre ese contenido fue porque el agente no recordaba lo que él escribió en las referidas notas. Veamos:

*"P (ininteligible) en Ciales. Oiga, y además de preservar la, la escena, le pregunto, ¿si usted recibió alguna instrucción en específico del Sargento?*

*R Sí, sí. El sargento Miguel A. Rosario me dijo: "Ve acá, como tú eres el guardia que más experiencia tiene, que más años... (ininteligible) aquí, este, entrevístate a las personas que están dentro de la casa y míralas a ver cómo se encuentran, tú sabes, el estado de ellos y me coge los datitos y me los da". Pues, yo hice eso, las instrucciones que él me dio. Este, voy entrevisto a las personas, uno a uno y tomo datos en la libreta. A la vez, cuando termino de tomar datos, que tenía una libreta esta, de, de argolla, y el Sargento me dice: "Pues dame los datos", y se lo doy, tú sabes, le dije: "Sargento, aquí están las generales de todos ellos, los da... más o menos lo que ellos me relataron", y le dije: Chequéelos, porque yo los noto que hay, hay alguno que yo otro que 'haiga', que 'haiga' bebido", tú sabes, que se le oye, que, que se le ve el aliento y se le nota el aliento y de la manera que hababan. Y me dijo: "No hay problema", y le doy los datos a él. Y me quedo, pues bregando con... (ininteligible), ayudando allí, que nadie entrara a la escena.*

*P ¿Y, y cuántas personas usted entrevistó allí?*

*R Bueno, yo entrevisté, si mal no recuerdo como a cuatro.*

*P A cuatro.*

*R Cuatro personas.*

*P ¿Y le cogió los nombres y los datos?*

*R Sí, sí. Yo le cogí los nombres y se los di al Sargento, tú sabes...*

*P ¿En las notas que usted me dice que le dio?*

*R Correcto, eso mismo.*

*P ¿Qué, qué us... qué, si usted recuerda a, cuál fue la, la información que usted puso en, en, en los datos?*

*R Licenciado, yo decirle así, o sea, con honestidad, si le digo así, que me dijeron cada cual, estaría mintiendo, no, tú sabes, yo les tomé las, los datos, si me dan las notas, si me trajeran las notas pues yo las puedo ver, re... refrescarme la memoria y decirle; pero cada cual, qué me dio, no tú sabes, no, no, tú sabes, decirle que sí, no, con exactitud qué me dijeron, no, que no...".*

La Defensa, sin objeción, preguntó sobre el contenido de la notas. La razón por la cual se vio impedida de continuar indagando no fue por objeciones del Ministerio Público. Fue que el testigo no recordaba la información que él escribió en sus notas. La Defensa no insistió en preguntar o indagar sobre el asunto. Pasó a otros temas. Todo lo anterior es base suficiente para concluir que el error no fue cometido.

## V

En virtud de lo expuesto, se confirma la Sentencia recurrida.

Lo acordó el Tribunal y lo certifica la Secretaria.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones